# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MANPOWER INC., et al.**

       **Plaintiffs,**

  **v.**                                 **Case No. 05-C-0276**

**JONATHAN P. MASON, et al.**

       **Defendants.**

## DECISION AND ORDER

On February 11, 2005, plaintiffs Manpower Inc., a Wisconsin corporation whose principal place of business is in Wisconsin, and Manpower Franchises, LLC, a limited liability company whose sole member is Manpower Inc., commenced this breach of contract action in state court against defendants Jonathan P. Mason, a citizen of Ohio, and Mancan, Inc., an Ohio corporation whose principal place of business is Ohio. Jonathan Mason is the controlling shareholder of Mancan, Inc. Defendants timely removed the action and filed counterclaims. I have jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Before me now is defendants' motion for a preliminary injunction.

## I. BACKGROUND

Since 1976, defendants have been plaintiffs' franchisees, operating under plaintiffs' trade name, "Manpower." Manpower and its franchisees are in the business of providing temporary personnel to a wide variety of employers. Defendants operate twenty-seven Manpower offices in and around Canton, Ohio; Ft. Myers, Florida; and Columbus, Ohio. The operation of these offices is governed by three separate franchise agreements, the "Canton Agreement," the "Ft. Myers Agreement," and the "Columbus Agreement." Defendants claim

to be "the third largest true Manpower franchisee in the county, with annual revenues in 2004 of approximately $73,130,000." (Mem. in Supp. [R. 13] at 3; Mason Aff. [R. 16] ¶ 6.)

The Canton franchise agreement contains a provision providing that if defendants are "in material breach or default of any of the [agreement's] terms," plaintiffs "shall" give defendants "a ninety (90) day prior written notice of termination" specifying the grounds for termination (Canton Agmt. ¶ 6.e.), and the other agreements contain substantially identical provisions.[1] The agreements also give defendants sixty days to cure breaches or defaults. If defendants do not cure the breaches or defaults "to the reasonable satisfaction" of plaintiffs within the cure period, the agreement is terminated. (Id.) In addition, each agreement lists several grounds for immediate termination, including failure to meet minimum sales quotas, bankruptcy or insolvency, and "conviction of a crime (which in [plaintiffs'] opinion may adversely affect the goodwill and interest of [plaintiffs])." (Id. ¶ 6.f.)

Each agreement also contains a provision, which takes effect upon termination, requiring defendants to assist plaintiffs "in every way possible to bring about a complete and effective transfer or relicensing" of the terminated franchise to plaintiffs or their designee. (Id. ¶ 10.e.) Further, each agreement contains a covenant prohibiting defendants from competing with plaintiffs in the temporary help industry for two years after termination. (Id. ¶ 7.a.)

On February 11, 2005, plaintiffs notified defendants that they were terminating all of the franchise agreements on the ground that defendants had failed to comply with provisions of the Immigration Reform and Control Act ("IRCA"), 8 U.S.C. § 1324 et seq., requiring employers to complete and retain "I-9 Forms" verifying each employee's eligibility for employment in the United States. In the course of an audit of I-9 compliance by offices

---

[1] Unless otherwise noted, all quotations from the agreements will be from the Canton Agreement. The agreements are attached as exhibits A, B and C to the Affidavit of Jonathan Mason.

operating under the Columbus Agreement, plaintiffs had discovered a number of instances of non-compliance by defendants.[2] Plaintiffs considered defendants' non-compliance to breach the provision in each franchise agreement requiring defendants to "abide by and follow all municipal, county, city, state and federal laws applicable to [the franchise], and all orders, rules and regulations issued pursuant thereto." (Canton Agmt. ¶ 4.g.) Further, plaintiffs considered defendants' non-compliance to be "incurable defaults and material breaches that go to the very essence" of the franchise agreements, and they therefore refused to provide defendants with an opportunity to cure the violations. (Mason Aff. [R. 16] Ex. E at 2.)

After sending the termination notice, plaintiffs commenced the present action seeking a declaration that defendants breached the franchise agreements and that their breach justified immediate termination. Plaintiffs argue that they were entitled to terminate the agreements without providing defendants with an opportunity to cure because defendants committed "incurable" breaches. Although in the termination notice, plaintiffs identified only defendants' I-9 non-compliance as an incurable breach, plaintiffs have since cited other alleged breaches which they believe also constitute grounds for termination without an opportunity to cure. Such alleged breaches include defendants' solicitation of customers outside their sales territory, their unauthorized use of plaintiffs' trade name, and the alleged unprofessional behavior of Jonathan Mason's son, Ryan Mason, who runs the offices operating under the Columbus Agreement.

Defendants contend that they have cured any I-9 problems, that plaintiffs had no legal basis for terminating them and that I should enjoin the terminations pending trial. Plaintiffs

---

[2]Although plaintiffs did not discover any I-9 violations in offices operating under the Canton or Ft. Myers Agreements, plaintiffs regarded the Columbus I-9 violations as a basis for terminating all three agreements.

have agreed to allow defendants to continue operating under the agreements until I decide the present motion.

## II. DISCUSSION

As the parties seeking a preliminary injunction, defendants have "the burden of demonstrating that [they have] a reasonable likelihood of success on the merits of [their] underlying claim[s], that [they have] no adequate remedy at law, and that [they] will suffer irreparable harm without the preliminary injunction." AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 803 (7th Cir. 2002); see also Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001). If defendants satisfy this burden, I must consider "the irreparable harm that the [plaintiffs] will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the [defendants] will suffer if relief is denied." Ty, Inc., 237 F.3d at 895. "This balancing involves a sliding scale analysis: the greater [defendants'] likelihood of success on the merits, the less strong a showing [they] must make that the that the balance of harm is in [their] favor." Foodcomm Int'l v. Barry, 328 F.3d 300, 303 (7th Cir. 2003). This sliding scale approach "is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." Ty, Inc., 237 F.3d at 895-86 (internal quotation marks and citation omitted). The district court's goal in performing the sliding scale analysis is to reach a decision that will minimize the consequences of being mistaken. That is, the court's goal is to minimize the consequences of either denying a preliminary injunction to a party who will go on to win the case on the merits or of granting an injunction to a party who will go on to lose. Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd., 780 F.2d 589, 593-94 (7th Cir. 1986); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 388 (7th Cir. 1984); see also AM Gen. Corp., 311 F.3d at 804 (stating that "the purpose of a preliminary injunction is

to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.") (internal quotation marks and citation omitted). Applying the above factors to the present case,[3] I conclude that the defendants are entitled to a preliminary injunction.

**A.      Adequacy of Remedy at Law / Irreparable Harm**

Although a party seeking a preliminary injunction must show both that he has no adequate remedy at law and that he will suffer irreparable harm absent injunctive relief, where the movant seeks only damages at trial, the two requirements merge. Roland Mach. Co., 749 F.2d at 386. In such a case, "the question is then whether the [moving party] will be made whole if he prevails on the merits and is awarded damages." Id. An award of damages at trial will be inadequate not only if it is wholly ineffectual, but also if it is "seriously deficient as a remedy for the harm suffered." Id. In the present case, defendants seek only damages at trial. However, they argue that recovering damages after a trial on the merits is an inadequate remedy because, if plaintiffs are allowed to terminate the agreements before trial, they will be forced out of business.

It is undisputed that if I do not enjoin plaintiffs from terminating the franchise agreements, defendants will have to shut down their businesses pending the trial. The agreements provide that upon termination, defendants must cease operating as Manpower franchisees and assist plaintiffs "in every way possible to bring about a complete and effective transfer" of the franchises to plaintiffs. (Canton Agmt. ¶ 10.e.) Further, the agreements contain covenants prohibiting defendants from becoming "associated" with "the operation of any temporary help business competitive to" plaintiffs' for two years after the termination of

---

[3]I must also consider whether the preliminary injunction "would harm or foster the public interest." AM Gen. Corp., 311 F.3d at 804. In the present case, it does not appear that granting or denying a preliminary injunction will have any appreciable effect on the public interest. Therefore, I will not discuss this factor further.

the franchise agreements. (Canton Agmt. ¶ 7.a.) The scope of these covenants effectively prevents defendants from participating in the temporary help industry anywhere in the United States. Thus, allowing plaintiffs to terminate the agreements before trial would not only put defendants out of business as Manpower franchisees, but also would prevent them from starting their own temporary help business or becoming franchisees of plaintiffs' competitors.

Plaintiffs contend that an award of damages at trial will be an adequate remedy for these harms if it turns out that defendants were wrongfully terminated. However, the Seventh Circuit has recognized that a damages remedy is inadequate if it "may come too late to save the . . . business [of the party seeking the preliminary injunction]." Roland Mach. Co., 749 F.2d at 386. The reason why a damages remedy is normally inadequate to compensate a party who has been wrongfully forced out of business is that going into bankruptcy "frustrate[s] later attempts to compute . . . damages." Classic Components Supply, Inc. v. Mitsubishi Elecs. Am. Inc., 841 F.2d 163, 164-65 (7th Cir. 1988); see also Am. Hosp. Supply Corp., 780 F.2d at 597-98 (stating that damages awarded in bankruptcy may not offset the loss of going-concern value); Roland Mach. Co., 749 F.2d at 386 (stating that damages awarded in bankruptcy probably will not cover all the losses incident to the bankruptcy). In the present case, defendants do not point to evidence in the record indicating that termination of the franchise agreements before trial would force them into bankruptcy. Rather, they state that termination would put them "out of business" pending the trial.[4] (Mason Aff. [R. 16] ¶ 18.) However, the Seventh Circuit has recognized that a damages award "may be inadequate even if the [party seeking a preliminary injunction] leaves the business without becoming

---

[4]Perhaps by "out of business" plaintiffs mean "insolvent" or "bankrupt," but the terms are not synonymous. Thus, for purposes of the present motion I presume that termination will not force defendants to declare bankruptcy before trial.

-6-

insolvent." Roland Mach., 749 F.2d at 386. This is so because, as explained below, the total deprivation of a business is not entirely measurable in monetary terms. Id.

The leading case recognizing that deprivation of the ability to engage in a business constitutes irreparable harm is Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970). There, in a case involving the termination of an automobile dealership, Judge Friendly stated that "the right to continue a business in which [the dealer] had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the [dealers] want to sell automobiles, not to live on the income from a damages award." Id. at 1205; see also Roland Mach. Co., 749 F.2d at 386 (quoting Semmes). The Semmes line of cases stands for the proposition that the "improper deprivation of an inveterate enterprise that, but for the defendant's challenged action, could be expected to continue" constitutes irreparable harm. ABA Distribs., Inc. v. Adolph Coors Co., 661 F.2d 712, 714 (8th Cir. 1981). In other words, depriving someone of his or her business inflicts a form of harm for which money cannot compensate.[5]

In the present case, defendants – who have been in business for almost thirty years – are engaged in an inveterate enterprise that, but for plaintiffs' challenged action, could be expected to continue. Absent a preliminary injunction, defendants will be deprived of their business as well as their ability to work in the temporary help industry. And even if defendants prevail at trial, it is unlikely that they will be able to simply pick up where they left off when they were terminated. Thus, under Semmes and its progeny, defendants would suffer irreparable harm even if an award of damages would be adequate to compensate for

---

[5] At oral argument, plaintiffs suggested that the Semmes line of cases applies only to small, "mom and pop" business owners, and is thus irrelevant to the present case. However, although Semmes involved a franchise run by a father and his son, see 429 F.2d at 1205, so does the present case. Further, although the Masons may be wealthier than the Semmes, judges "have taken an oath to do justice to rich and poor alike." Am. Hosp. Supply Corp., 780 F.2d at 598.

the pecuniary harm they would incur pending the trial. I therefore find that plaintiffs have shown that they lack an adequate remedy at law and will suffer irreparable harm if I do not grant them preliminary relief.

**B.  Likelihood of Success on the Merits**

The ultimate issue in the present case is whether plaintiffs may terminate defendants pursuant to the franchise agreements without giving them a chance to cure their alleged breaches.[6] Plaintiffs argue that they may immediately terminate defendants despite the cure provisions of the agreements because defendants' breaches are "incurable as a matter of law." (See Mem. in Opp. [R. 24] at 15.) However, as explained below, I find plaintiffs' argument unpersuasive, and I am reasonably certain that defendants will prevail on the issue.

Plaintiffs argue that "'[a] contract may be terminated at common law even in the face of a provision requiring an opportunity to cure where the nature of the default renders cure impossible.'" (Mem. in Opp. [R.24] at 17 (quoting Jason J. Stover, No Cure, No Problem: State Franchise Laws and Termination for Incurable Defaults, 23 Franchise L.J. 217, 219 (2004)). Plaintiffs define an incurable breach as one that "goes to the very essence" of the contract, or one that evidences a lack of trustworthiness. (Id. at 1-2, 17-22.) Plaintiffs' then argue that the I-9 violations go to the essence of the franchise relationship because plaintiffs' business is "supplying legally qualified temporary help." (Id. at 1 (emphasis added).) Plaintiffs further argue that defendants' other breaches, such as continued extra-territorial solicitation and Ryan Mason's unprofessional behavior, show that they are untrustworthy franchisees, and that therefore plaintiffs should not have to continue the relationship.

---

[6]Because I have jurisdiction based on diversity of citizenship, I must evaluate defendants' likelihood of success on the merits by applying state substantive law as I believe the highest court of the state would apply it. See, e.g., State Farm Mut. Auto. Ins. Co. v. Pate, 275 F.3d 666, 669 (7th Cir. 2001) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). In the present case, the parties agree that the relevant state law is Wisconsin's.

Plaintiff's argument, however, is flawed, and the flaw lies in plaintiffs' definition of an incurable breach. An incurable breach is not, as plaintiffs assert, a material breach that goes to the essence of the contract. Rather, an incurable breach is either one that the contract provides no opportunity to cure or one that cannot logically be cured, such as a franchisee's failure to meet a sales quota within a specified time. See Stover, supra, at 218-19. Plaintiffs' definitional error causes their argument to collapse because, as explained below, the remedy available to a non-breaching party for a breach that goes to the essence of a contract is not termination but rescission, yet plaintiffs are seeking to terminate the agreements, not rescind them.

As I use the term,[7] "[r]escission, simply stated, is the unmaking of a contract. It is a renouncement of the contract and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract." United States v. Cook, 406 F.3d 485, 488 (7th Cir. 2005) (internal quotation marks, alteration, and citation omitted); see also Black's Law Dictionary 1308 (7th ed. 1999) (defining "rescission" as "[a] party's unilateral unmaking of a contract for a legally sufficient reason, such as the other party's material breach"); 26 Lord, supra. § 68.3 at 49 (defining "rescind" as "to abrogate or annul"). Under the common law, "[r]escission is generally available as a remedy or defense for a nondefaulting party and restores the parties to their precontractual positions." Black's Law Dictionary 1308. Rescission is an alternative remedy to an action for damages, and is generally available where there has been a "substantial or material" breach of the contract –

---

[7]Courts and lawyers use the terms "rescission," "termination," "cancellation," and "discharge" in different senses. See 13 Jenkins, Corbin on Contracts – Discharge § 67.2 (Joseph M. Perillo, ed., rev. ed. 2003); 26 Richard A. Lord, Williston on Contracts § 68.3 (4th ed. 2003). Thus, it is important that I clarify how I use the terms.

that is, a breach that "goes to the essence or root of the contract." 26 Lord, supra, § 68.2 at 37-41.[8]

In contrast, what the parties in the present case refer to as "termination" is what I will call "exercising a reserved power of termination." By agreement, parties may expressly reserve a power of termination to either or both of them. 13 Jenkins, supra, § 68.9 at 247. Exercise of this reserved power is different than rescission. As Corbin's treatise states, "[t]he power to terminate must, however, be distinguished from the right an injured party has to cancel the contract for a breach that is a total breach of contract or that goes to the essence of the agreement."[9] Id. at 248. Further, unless a contract indicates otherwise, the presence of a provision permitting termination does not supplant the right of a contracting party to rescind if the other party commits a breach that goes to the essence of the contract. Again, as Corbin's treatise puts it:

> While parties may state those limited contexts in which either or both of them may put an end to the agreement, including circumstances that might otherwise constitute a partial or total breach without fear of a subsequent adverse determination, such a reservation does not limit the fundamental right of a party to put an end to the agreement by cancellation [i.e., rescission] for the other's total breach of their agreement. The purpose and goals of limiting the right to terminate in the context of an exclusive dealing, distributorship, or franchise agreement are not only to provide a means for the manufacturer or seller to protect its trademark or service mark, and its corresponding good will but also to protect the buyer, distributor, or franchisee from a forfeiture of its investment of money, time, and skill by arbitrary termination by the manufacturer. These goals and purposes are clearly distinguishable from the right to cancel [i.e., rescind] for a total breach of the agreement. These two rights coexist. A reservation of a right to terminate in the absence of breach or upon an express condition that may constitute a partial or total breach does not displace the right to cancel [i.e., rescind] for a total breach.

---

[8]Rescission is not only a remedy for breach of contract but can occur through the mutual agreement of the parties. See Blacks Law Dictionary 1308; 13 Jenkins, supra, § 67.8 at 47.

[9]Corbin's treatise uses the term "cancellation" as I use the term "rescission." See 13 Jenkins, supra, § 67.2 at 8-9 (stating that "cancellation occurs when either party puts an end to the contract for breach by the other") (internal quotation marks omitted).

13 Jenkins, supra, at 248-50 (emphasis in original, footnotes omitted). Thus, when a contract includes a power of termination and a party commits a breach, depending on the nature of the breach, the nonbreaching party may be able to elect between rescinding and terminating the contract.[10]

In the present case, the important point is that a breach that may trigger a party's right to rescind will not necessarily entitle the party to exercise a reserved power of termination. Under Wisconsin law, a party may rescind a contract "if the other party has breached the contract in a substantial manner so serious as to destroy the essential objects or purposes of the contract." Wis. JI – Civil § 3076 (2001). However, whether a party may exercise a reserved power of termination depends on whether the conditions precedent to the exercise of such power have been satisfied. See 13 Jenkins, supra, § 68.9(1), at 254 (stating that "[i]f a contractual privilege to put an end to a contract by notice is subject to the condition of some breach of duty by the other party, the occurrence of such a breach or some unsatisfactory performance is a condition precedent to the exercise of this privilege"). In other words, a party

---

[10] The cases relied on by plaintiff stand for the proposition that the reservation of a power to terminate a contract does not displace the common law right to rescind when a party commits a material breach that goes to the essence of the contract. For example, in the case that plaintiffs characterize as "seminal" in favor of their position (Mem. in Opp. [R. 24] at 18), the issue was whether a contractual provision providing an opportunity to cure prior to termination was the exclusive means of "terminating" the contract. Olin Corp. v. Central Indus., Inc., 576 F.2d 642, 646-48 (5th Cir. 1978). The court began its analysis by recognizing the general rule that "if a contracting party has committed a material breach of contract the other parties should be excused from the obligation to perform further." Id. at 646 (citing Williston on Contracts, Third Edition, Section 864). The court then noted that Mississippi followed the general rule and indicated that it would use "termination" synonymously with "rescission," stating that "[a]s far as we can tell it has always been the rule in Mississippi that rescission is one of the remedies available to an injured party in the event of a material breach." Id. at 646 (emphasis added). The court added a footnote citing Williston's statement that "termination" was often equated with "rescission." Id. at 646 n.6. The court also addressed whether a provision providing an opportunity to cure prior to termination supplanted a party's common law right to rescind in the event of a material breach. Id. at 647-48. In answering this question in the negative, the court adopted what it referred to as the "Williston view," i.e., that "[u]nless a contract provision for termination for breach is in terms exclusive, it is a cumulative remedy and does not bar the ordinary remedy of termination [i.e., rescission] for a breach which is material, or which goes to the root of the matter or essence of the contract." Id. at 647 (internal quotation marks and citations omitted); see also Larken, Inc. v. Larken Iowa City Ltd. P'ship, 589 N.W.2d 700, 701-705 (Iowa 1998) (following Olin Corp. and recognizing that a provision providing an opportunity to cure is a cumulative remedy that does not supplant the ordinary right to terminate (i.e., rescind) for a material breach).

can only exercise a power of termination reserved in a contract in accord with the contractual terms governing the exercise of such power. Thus, if a contract does not authorize a party to terminate the contract when the other party commits a breach that goes to the essence of the contract, the nonbreaching party may not exercise such a power. Instead, in such a case, the nonbreaching party must resort to rescission.

In the present case, plaintiffs seek to show that defendants committed breaches that go to the very essence of the franchise agreements, but instead of seeking to rescind the contracts they wish to exercise their reserved power of termination. That is, plaintiffs do not seek simply to put an end to the franchise agreements but rather to require defendants to adhere to the agreements' post-termination provisions such as the noncompete clauses and the provisions requiring defendants to transfer their business to plaintiffs. If plaintiffs were seeking only rescission, they could not expect defendants to comply with the agreements' post-termination provisions since, upon rescission, such provisions would cease to exist.

Because defendants seek to terminate rather than rescind the agreements, they must show that the conditions precedent to the exercise of their reserved power of termination are satisfied. Under the agreements, except if defendants fail to meet sales quotas, go bankrupt, become insolvent, or are convicted of crimes, plaintiffs cannot exercise their power to terminate unless they give defendants sixty days to cure the deficiency in question. In the present case, it is undisputed that defendants did not fail to meet sales quotas, did not go bankrupt or become insolvent, and were not convicted of crimes. It is also undisputed that plaintiffs did not give defendants an opportunity to cure. Thus, plaintiffs had no right to exercise their reserved power to terminate the agreements. I conclude, therefore, that plaintiffs are reasonably certain to succeed on the merits of their claim that plaintiffs' termination would be unlawful.

As indicated, however, plaintiffs may be entitled to rescind the agreements. But because I am uncertain as to whether plaintiffs are interested in rescission and because the parties have not briefed the issue, I express no view on the matter.[11]

**C. Irreparable Harm to Plaintiffs and Balance of Harms**

Plaintiffs argue that if I enjoin them from terminating defendants pending trial, defendants' continuing misconduct will irreparably harm the Manpower name. I presume that damage to goodwill of the sort that plaintiffs allege constitutes irreparable harm. See, e.g., Re/Max North Central, Inc. v. Cook, 272 F.3d 424, 432 (7th Cir. 2001); Ty, Inc., 237 F.3d at 902; Gateway E. Ry. Co. v. Terminal R.R. Assoc. of St. Louis, 35 F.3d 1134, 1140 (7th Cir. 1994). However, even assuming that if I enjoin plaintiffs from terminating defendants, defendants will likely damage the Manpower name, the fact that termination will cause defendants to suffer irreparable harm combined with my view that defendants will succeed on the merits tips the balance of harms decidedly in defendants' favor. Thus, I will grant defendants' motion for a preliminary injunction.

**D. Security**

Fed. R. Civ. P. 65(c) requires that I condition the grant of an injunction upon the posting of security. The purpose of requiring the party obtaining an injunction to post security is to compensate the enjoined party, if it prevails on the merits, for the pecuniary harm caused by a preliminary injunction. Ty, Inc. v. Publ's Int'l Ltd., 292 F.3d 512, 516 (7th Cir. 2002); see also Cronin v. United States Dep't of Agric., 919 F.2d 439, 446 (7th Cir. 1990) (noting that

---

[11] I also express no view on whether defendants would be entitled to a preliminary injunction prohibiting plaintiffs from rescinding the franchise agreements. In the present decision, my analysis of the irreparable harm and balance of harms factors is based in considerable part on the fact that in the absence of an injunction plaintiffs would take over defendants' business and prevent them from competing in the temporary help industry, thereby putting defendants out of business. Since rescission would not necessarily put defendants out of business, my analysis of such factors would be different if this were a rescission case.

injunction bond compensates for pecuniary harm caused by injunction). Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond. Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000). However, a district court cannot simply set the bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that a reviewing court can determine whether such number "was within the range of options from which one could expect a reasonable trial judge to select." Gateway E. Ry. Co., 35 F.3d at 1141-42 (internal quotation marks and citation omitted).

In the present case, plaintiffs argue that if they are forced to continue dealing with defendants as franchisees, defendants might "undermine Manpower's relationship with key national accounts . . . and begin making preparations to become a competitor of Manpower." (July 5, 2005, Letter [R. 60] at 2.) Plaintiffs estimate that defendants might damage them in the amount of $20 million, which represents "the amount of business that [defendants] do with national accounts." (Id.) However, plaintiffs present no affidavit or other evidence supporting this figure.

The problem with plaintiffs' basing their bond request on the possibility that defendants' behavior as Manpower franchisees may cost Manpower its national accounts is that plaintiffs present no evidence that any customer is dissatisfied with defendants' services. Most of plaintiffs' problems with defendants involve defendants' alleged disdain for their obligations under the franchise agreements. However, the record discloses no customers which have complained much less left Manpower on account of defendants' behavior. Thus, plaintiffs' claim that permitting defendants to remain as Manpower franchisees pending trial will cause them to lose customers is highly speculative. Further, the present injunction does no more

than prevent plaintiffs from exercising their power to terminate under the franchise agreements; it does not authorize defendants to breach the agreements. If defendants commit a future breach which causes plaintiffs to lose a customer, plaintiffs may commence a new action and possibly obtain damages for the loss of such customer. And the damages available in such an action would not be limited to the amount of the present bond because the amount of the bond limits damages only for harm caused by this injunction.

The real measure of the pecuniary harm attributable to the injunction is the difference between what plaintiffs' profits would be if they terminated the agreements, took over defendants' business and enforced the noncompete clauses, and what their profits will be now that they cannot do these things. Plaintiffs have presented no evidence on this issue, and thus I am unable to arrive at even the roughest of estimates. Accordingly, I will require defendants to post only a modest bond. However, plaintiffs may apply for a larger bond if they can produce competent evidence of the pecuniary harm they may reasonably expect to suffer on account of this injunction.

### III. CONCLUSION

For the reasons stated,

**IT IS ORDERED** that defendants' motion for preliminary injunction is **GRANTED**. Plaintiffs and their officers, agents, servants, employees, and attorneys, and those in active concert or participation with them, are hereby **ENJOINED** from terminating any of the three franchise agreements between plaintiffs and defendants, provided that defendants give security by depositing with the Clerk the sum of $1,000 in a cashiers check or other certified funds within seven days of the date of this order. Failure to provide the requisite security will cause this order to lapse of its own accord. If defendants provide the requisite security, this

-15-
Case 2:05-cv-00276-LA   Filed 07/12/05   Page 15 of 16   Document 65

preliminary injunction shall remain in effect until further order of the court, and the $1,000 security shall remain with the Clerk until further order of the court.

**IT IS FURTHER ORDERED** that defendants' motion to strike plaintiffs' surreply is **DENIED**.

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **July 27, 2005, at 11:00 a.m.** The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 12th day of July, 2005.

BY THE COURT:

s/Lynn Adelman
LYNN ADELMAN
U.S. District Judge