# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MANPOWER INC., and
MANPOWER FRANCHISES, LLC,

               **Plaintiffs,**

      **v.**                                               **Case No. 05-C-0276**

JONATHAN P. MASON, and
MANCAN, INC.,

               **Defendants.**

## DECISION AND ORDER

On February 11, 2005, plaintiffs Manpower Inc., and Manpower Franchises, LLC, (collectively "Manpower") commenced this diversity action in state court against one of its franchisees, Mancan, Inc., and Mancan Inc.'s principal shareholder, Jonathan P. Mason (collectively "Mancan"). Manpower alleged that Mancan materially breached the franchise agreements between the parties and sought to terminate them by exercising its reserved powers of termination under the agreements. Mancan timely removed the action and moved for a preliminary injunction barring such termination. On July 12, 2005, I granted Mancan's motion. See Manpower v. Mason, 377 F. Supp. 2d 672 (E.D. Wis. 2005).

In the decision, I noted that the law distinguished between exercising a reserved power of termination under a contract and rescinding, i.e., abrogating or cancelling the contract. I also noted that Manpower did not seek simply to end the franchise agreements but rather to require Mancan to adhere to their post-termination provisions such as the non-compete clauses and the requirements that Mancan transfer its business to Manpower. Ultimately, I concluded that Manpower had not established that the conditions precedent

to the exercise of its reserved powers of termination under the agreements had been satisfied. I did not address the question of whether Manpower could rescind the agreements.

On July 25, 2005, by letter to Mancan, Manpower rescinded the agreements and demanded that Mancan cease using the trade name "Manpower." In its letter, Manpower stated that Mancan breached the agreements in "material" ways that reflected "a lack of honesty and integrity" such that the breaches could not be cured. (Joerres Decl. Ex. C.) Mancan responded that Manpower could not lawfully rescind the agreements, and it declined to stop using the Manpower name. Manpower now moves for a preliminary injunction barring Mancan from using its name on the ground that such use violates the Lanham Act. Mancan cross-moves for a preliminary injunction enjoining Manpower's rescission of the agreements.

## I. FACTS AND BACKGROUND

Manpower is in the business of providing temporary employees to a wide variety of employers throughout the world. It conducts business in part through branch offices and in part through franchises. Mancan operates Manpower franchises in Canton, Ohio ("Mancan-Canton") (since 1976), Fort Myers, Florida ("Mancan-Fort Myers") (since 1992), and Columbus, Ohio ("Mancan-Columbus") (since 1996). Mancan purchased the Columbus franchise for approximately $1.6 million. At present, it accounts for slightly less than fifty percent of Mancan's $73 million in annual gross revenue.

The three Mancan franchises are governed by separate identically-worded agreements. Each agreement grants Mancan a license to use Manpower's name and authorizes it to operate in a defined geographical territory. In addition, the agreements

2

impose a variety of duties on Mancan including the obligation to use Manpower's name only in ways approved by Manpower, to follow Manpower's procedures and comply with its standards, to refrain from competing with Manpower, to promote the services of other Manpower offices, and to abide by all laws and regulations applicable to the business of providing temporary employees.

Beginning in the late 1990's, Manpower became dissatisfied with the operation of Mancan-Columbus, which Jonathan Mason's son, Ryan Mason ("Ryan") runs. Ultimately, Manpower concluded that Mancan-Columbus breached the franchise license agreement in ways sufficiently serious to justify cancellation of the three franchise agreements with Mancan. Manpower experienced the following problems with Mancan-Columbus:

**Initial Problems with Ryan**

In September 2001, Manpower's executive vice president, Terry Hueneke, met with Jonathan Mason regarding Manpower's concerns with Ryan. After the meeting, Hueneke wrote a letter to Jonathan Mason summarizing Ryan's deficiencies as Manpower perceived them. These included:

- poor judgment as evidenced by expressing his disagreement about pricing policies with visiting Manpower personnel in front of a customer;
- dishonesty – a visiting Manpower employee observed Ryan take and copy confidential materials from a competitor's office located in a customer's facility;
- repeatedly doing business outside franchise territory;
- failing to follow directions and to cooperate with Manpower;
- making many unfounded complaints about Manpower;
- immaturity as evidenced by throwing tantrums and making vulgar remarks to female employees;
- rudeness as evidenced by treating Manpower staff in a hostile manner;

Hueneke advised Jonathan Mason that Manpower had received more complaints about Ryan and Mancan-Columbus than it had received in the previous twelve years. He said

that he considered the problem "fixable" but that it would "require commitment." (Hueneke Decl. Ex. B.)

### **Ongoing Territorial Violations**

Despite Hueneke's warning, Mancan-Columbus continued to operate outside its licensed territory. In February 2002, it solicited two customers in Jackson County, Ohio, outside its territory. When Manpower called the matter to Ryan's attention, he assured it that he would take steps to prevent further violations. However, after the conversation, Mancan-Columbus again solicited business in Jackson County, this time by placing ads in the county newspaper. In July 2002, Jonathan Mason requested that Manpower license Mancan-Columbus to do business in Knox and Holmes Counties, Ohio, but Manpower declined, explaining that it served those counties through branch offices. Notwithstanding the conversation, Mancan-Columbus surreptitiously opened an office in Holmes County – which Manpower subsequently forced it to close. In October 2003, Manpower discovered that Mancan-Columbus again was providing services to a customer outside its territory, and Manpower required Mancan-Columbus to turn the customer over to the appropriate branch office. However, Mancan-Columbus continued to supply temporary employees outside its territory, and other Manpower franchises continually complained to Manpower about Mancan-Columbus's conduct.

After commencing the present action, Manpower discovered that Mancan-Columbus was engaged in extensive and systematic extra-territorial activity. Ryan had instructed Mancan-Columbus employees to solicit customers outside the franchise's territory. Ryan told such employees that he knew that the franchise agreement prohibited such solicitation, but that it would generate revenue. On one occasion, a Mancan-Columbus

4

manager, Tracy Rader, warned Ryan that a potential customer was located outside of the franchise's territory, but Ryan directed her to close the deal anyway. Manpower reprimanded Ryan on many occasions for doing business outside of Mancan-Columbus's licensed area. However, Manpower later discovered that after such reprimands, Ryan would send an e-mail to franchise employees purporting to admonish them not to sell outside of franchise territory and copy Manpower, but immediately after doing so, would countermand the e-mail and tell franchise employees to ignore it, explaining that he had sent the e-mail solely to make Manpower believe that he took its warning seriously.

In supplying employees extra-territorially, Mancan-Columbus competed with Manpower and other Manpower franchises. Manpower provides temporary employees to a number of companies on a national basis, and it utilizes branches and franchises to service such accounts. Because the cost of labor varies throughout the country, Manpower consults with the appropriate branch offices and franchises before quoting a price to a national customer. In 2002, a company headquartered in Columbus, Butler Veterinary Supplies ("Butler"), was shopping for an agency to manage its temporary help needs throughout the country. Mancan-Columbus discovered this and, without notifying Manpower or any other franchises, entered into an agreement with Butler to provide temporary employees to it throughout the United States. Mancan-Columbus set a price for such employees without consulting any local Manpower offices. It then purported to offer the extra-territorial business to local Manpower offices, but often such offices could not supply employees at the price that Mancan-Columbus had set. Thus, to satisfy Butler's needs outside of its licensed territory, Mancan-Columbus contracted with Manpower competitors. Subsequently, Mancan-Columbus entered into agreements similar to its

5

agreement with Butler with other national companies headquartered in Columbus, but it no longer even purported to offer the extra-territorial business to other Manpower offices. Rather, it contracted with Manpower competitors without advising either Manpower corporate or local Manpower offices.

Mancan-Columbus entered into Butler-type agreements with Columbus-based companies, Big Lots Stores, Inc. ("Big Lots") and Wasserstrom and Sons ("Wasserstrom"). In the case of Big Lots, Manpower corporate actually submitted a bid to supply temporary employees on a national basis. A Manpower representative was unable to attend a meeting regarding the bid at Big Lots, so it asked Mancan-Columbus employee, Rader, to attend on its behalf. At the meeting, Big Lots informed Rader that another company had underbid Manpower. When Rader informed Ryan of this, he directed her to submit a bid on behalf of Mancan-Columbus underbidding both Manpower and the other company. Big Lots accepted Mancan-Columbus's bid, and Ryan directed Rader that outside its territory, she should use Manpower competitors to service the account, and "leave Manpower out of this." (Rader Supplemental Decl. ¶ 11.)

On one occasion, Wasserstrom requested that Mancan-Columbus supply employees in Steubenville, Ohio, outside of its territory although at a price that it had previously set. Mancan-Columbus contacted the local Manpower franchise, which contacted Manpower to complain that Mancan-Columbus had set prices outside its territory. Manpower contacted Jonathan Mason, who falsely represented that Mancan-Columbus had ceased supplying employees to Wasserstrom outside its licensed territory. In fact, Mancan-Columbus continued to supply employees to Wasserstrom outside its territory by contracting with Manpower competitors.

6

Manpower ultimately audited Mancan-Columbus's Butler, Big Lots, and Wasserstrom accounts, and the audit disclosed that Mancan-Columbus used sixty-nine different Manpower competitors to place temporary employees in thirty different states and billed nearly $3 million for the services of such employees.

### Failure to Complete and Retain I-9 Forms

Both federal law and Manpower's franchise agreements require franchises to complete and retain I-9 forms, which indicate that employees are eligible to work in the United States. Manpower emphasizes the importance of this requirement to franchises. Mancan-Columbus consistently disregarded its obligation to complete and retain I-9 forms. For example, in 2001, a newly hired Mancan-Columbus manager discovered that Mancan-Columbus had failed to fill out or had incompletely filled out a substantial number of I-9 forms. She suggested to Ryan that the franchise train its employees regarding the I-9 requirement. Ryan responded that she should concentrate on increasing franchise revenue and that the franchise was "not the INS" and should let the INS do its job. (Davis Decl. ¶ 5.) In 2002, Mancan-Columbus supplied a customer with two temporary employees who were arrested and discovered to be illegal aliens. Subsequently, the customer discovered that nine other Mancan-Columbus-supplied employees were also illegal aliens. Ryan's response to the incident was "[w]e're not the INS. Let them weed them out," and "if you tie a bow-tie around a temporary employee, he is going to make you money regardless of who they are." (Davis Decl. ¶¶ 5, 6.)

On March 15, 2004, Manpower informed Mancan-Columbus that it would audit its I-9's for two accounts, McGraw-Hill, a publishing company, and Scotts, a lawn care company, and instructed it to make available all I-9's for those companies' current

7

employees and employees assigned in the past year. On March 17, Manpower's auditor arrived accompanied by a corporate security specialist whom Manpower sent because Ryan had a history of volatile behavior. The audit disclosed numerous I-9 violations, and, in fact, the auditor stated that they were the most egregious she had seen in her sixteen years at Manpower.

In addition, Ryan attempted to prevent Manpower from discovering the violations and reacted vindictively when an employee disclosed them to the auditor. Ryan knew that a Mancan-Columbus employee, Candy Davis, had a folder containing over two hundred improperly filled out I-9 forms relating to McGraw-Hill, which she had taken out of employee files and placed in her office. On the day that Manpower announced the audit, Ryan fired Davis and directed another employee to search her office for the folder. The employee located the folder and gave it to another employee who put it in a box. However, the employee who had located it thought that it fell within the description of documents that Manpower had demanded with respect to the audit. So, she retrieved it and turned it over to the auditor. Ryan subsequently reprimanded the employee, telling her that she should have just "put it back into the box" (Kiner Decl. ¶ 13), and rescinded his previous promise to promote her. When she responded that I-9's were a legal matter, Ryan responded that he was "sick and tired of the word 'legal' coming out of your mouth." (Id.)

Mancan-Columbus contends that after the audit, it corrected the I-9 problem.

**Misuse of Manpower's Name**

Ryan established a consulting firm known as the Ascend Group, which he falsely represented to the public was a division of Manpower. In addition, at his deposition, Ryan falsely stated that he had no knowledge that the firm had been described as a division of

8

Manpower but subsequently acknowledged signing a letter describing the firm in that way.

**Ryan's Deportment**

Ryan also became involved in several incidents that embarrassed Manpower. In 2003, at Manpower's national convention in San Antonio, police handcuffed him in connection with an altercation that began when he tried to enter a stranger's car. In 2004, at Manpower's national convention in Orlando, he became involved in an altercation with hotel employees after locking himself out of his hotel room in his underwear while intoxicated.

As previously stated, on July 25, 2005, Manpower sent Mancan a letter rescinding the parties' franchise license agreements. In its letter, Manpower stated as follows:

> During our investigation in connection with your motion for a preliminary injunction, Manpower Inc. learned that Mancan, Inc. has engaged in a series of actions which, individually and collectively, represent a substantial and material breach of the Canton, Columbus and Ft. Myers License Agreements between Mancan and Manpower Inc.
>
> Specifically, in addition to the I-9 violations which have been described in previous correspondence and in detail in the litigation between Manpower and Mancan, we have learned that (contrary to what we were told by Mancan in the past) Mancan intentionally violated the territorial restrictions contained in the License Agreements and, in fact, encouraged its employees to solicit business outside of Mancan's territory. We have also learned that Mancan has worked with competitors of Manpower to provide temporary help services for companies outside of Mancan's licensed territory, in direct competition with other Manpower franchisees and branch offices. We have also learned that the defendants have misrepresented that a company which they established, called the Ascend Group, is a "division" of Manpower when, in fact, it is not associated with Manpower in any way.
>
> These very material breaches of both the letter and the spirit of the License Agreements make it impossible for the parties' [sic] to maintain a relationship. The breaches reflect a lack of honesty and integrity on the part of the defendants and, as such, are not curable. Thus, Manpower is hereby rescinding the License Agreements.

9

We expect that Mancan will cease using the Manpower name, trademark and logo, and that Mancan will return to Manpower forthwith all information that relates to Manpower, its programs and processes. To accomplish that, we suggest that your attorneys contact our attorneys to work out an orderly return of our property.

(Joerres Decl. Ex. C.)

Manpower bases its rescission of the agreements with Mancan-Canton and Mancan-Fort Myers on the conduct of Mancan-Columbus and the fact that Mancan operates all three franchises. Manpower does not contend that the Mancan-Canton and Mancan-Fort Myers franchises engaged in any separate misconduct.

I will add additional facts as required in the course of the decision.

## II. DISCUSSION

A party seeking a preliminary injunction must demonstrate that it has some likelihood of success on the merits, that there is no adequate remedy at law, and that it will suffer irreparable harm if the injunction is not granted. <u>AM Gen. Corp. v. DaimlerChrysler Corp.</u>, 311 F.3d 796, 803 (7th Cir. 2002); <u>see also</u> <u>Ty, Inc. v. Jones Group, Inc.</u>, 237 F.3d 891, 895 (7th Cir. 2001). If the party satisfies this burden, I must then consider "the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied," and consider the public interest. <u>Ty, Inc.</u>, 237 F.3d at 895. Sitting as a court in equity, I weigh all factors and utilize a "sliding scale" approach; "[t]hat is, the more likely the plaintiffs' chance of success on the merits, the less the balance of harms need weigh in its favor." <u>Promatek Indus., Ltd. v. Equitrac Corp.</u>, 300 F.3d 808, 811 (7th Cir. 2002). My goal is to minimize the consequences of either denying a preliminary injunction to a party who will go on to win the case on the merits or of granting an injunction to a party who will go

10

on to lose. Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd., 780 F.2d 589, 593-94 (7th Cir. 1986).

I now consider separately each of the factors relevant to the decision to grant or deny the parties' requests for preliminary relief.

## A. Likelihood of Success on the Merits

In the present case, deciding which party is likely to succeed on the merits requires that I determine whether it is likely that Manpower lawfully rescinded the agreements. I apply state law to this question, see Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), and the parties agree that Wisconsin law applies. Under Wisconsin law, a party may rescind a contract "if the other party has breached the contract in a substantial manner so serious as to destroy the essential objects or purposes of the contract." Wis. JI-Civil § 3076 (2001). It is "well established that a material breach by one party may excuse subsequent performance by the other." Mgmt. Computer Servs, Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 183 (1996). Even in the face of a specific contractual provision authorizing termination, a party may suspend its future performance of a contract based on the other party's material breach of the contract. Entzminger v. Ford Motor Co., 47 Wis. 2d 751, 755 (1970) (noting that "[s]uch a clause may be binding as a basis for the exercise of the remedies provided in the contract; but the clause does not have vitality or exclusiveness in determining materiality of the breach for the purpose of the exercise of the common-law right of nonperformance for a material breach").

However, a party may not suspend its future performance of contractual obligations upon every breach. Rather, the breach or breaches must "destroy the essential object of the contract." Appleton State Bank v. Lee, 33 Wis. 2d 690, 693 (1967). In other words,

11

the breach or breaches must "significantly deprive [plaintiff] of the benefit it reasonably expected under the contract." Mgmt. Computer Servs., 206 Wis. 2d at 186. In determining whether a party's breach or breaches destroys the essential object of the contract, a court may consider the character of the promised performance, the purposes it was expected to serve and the extent to which nonperformance has defeated those purposes. M & I Marshall & Ilsley Bank v. Pump, 88 Wis. 2d 323, 333 (1979). In making this determination, a court may consider earlier as well as more recent events. Nagle Motors, Inc. v. Volkswagen N. Cent. Dist., Inc., 51 Wis. 2d 413 (1971).

A party may rescind a contract even if both parties cannot be restored to the position they were in before the contract took effect. It is a common misperception that rescission or, as it is sometimes referred to, repudiation, cancellation or discharge, requires a complete restoration of the parties to their status prior to entering into the contract. Richard A. Lord, Williston on Contracts § 68.3 (4th ed. 2003) (noting that "in many cases where a partly performed contract is rescinded by the act of one party for the fault of the other, restoration of what has been received or its value, is not a condition qualifying the right to rescind"); see also 12 Corbin on Contracts § 1130 (interim ed. 2002) (indicating that in the case of rescission for material breach, a number of factors might make it inequitable to restore the parties to their pre-contract positions but where this was so, a court could nevertheless fashion an appropriate remedy).

The nature of the contract at issue may bear on whether a party may rescind it. The present case involves franchise agreements. Franchise agreements are licenses "coupled with restrictions designed to enforce either uniformity of operation or a minimum standard of service." Gladys Glickman, Franchising § 2.03[2] (1999). A franchisor may place

12

significant restrictions on a franchisee's method of operation and quality of delivery in order to protect its product. Byron E. Fox & Henry C. Su, Franchise Regulation – Solutions in Search of Problems?, 20 Okla. City U. L. Rev. 241, 252-53 (1995). Further, the franchise relationship "engenders multi-leveled relations: personal and economic, corporate and political," and in such a relationship, commitment is particularly important. Gillian K. Hadfield, Problematic Relations: Franchising & the Law of Incomplete Contracts, 42 Stan. L. Rev. 927, 928 (1990). This is so because a franchisor can threaten a franchisee's investment, and a franchisee can significantly affect a franchisor's reputation. Id. In addition, the parties to a commercial contract such as a franchise agreement must deal with each other fairly and in good faith. Home Valu, Inc. v. Pep Boys, 213 F.3d 960, 965-66 (7th Cir. 2000). Thus, the essential object of a franchise agreement is that the franchise succeed economically while abiding in good faith by the terms and restrictions contained in the agreement.

With the foregoing principles in mind, I ask which party is more likely to succeed on the merits of its claim. As previously indicated, the answer to this question depends on whether Manpower justifiably rescinded the franchise agreements, which in turn depends on whether Mancan-Columbus destroyed their essential object. Mancan contends that I need not address this question because the parties' long-standing relationship made it impossible to restore their pre-contract status and thus barred rescission regardless of Mancan-Columbus's conduct. However, as previously indicated, a party may rescind a contract even if the parties cannot be restored to their status prior to entering into the contract. Thus, I reject Mancan's claim that the long-standing relationship between the parties constituted a per se bar to rescission.

13

For the reasons stated below, I conclude that Manpower is highly likely to succeed on the merits of its claim that Mancan-Columbus breached its franchise agreement in material ways and that the breaches destroyed the essential object of such agreement.[1] I begin the analysis by discussing Mancan-Columbus's extra-territorial activity. Mancan does not dispute that on numerous occasions Mancan-Columbus supplied temporary employees outside its licensed territory. Rather, it denies that such activity violated the franchise agreement. Thus, I must analyze the agreement to ascertain the parties' intent. Johnson Controls, Inc. v. Employers Ins. of Wausau, 264 Wis. 2d 60, 85 (2003). I start with the language of the agreement, State ex rel. Journal/Sentinel , Inc. v. Pleva, 155 Wis. 2d 704, 711 (1990), and consider it in the context of the contract as a whole, Craigs, Inc. v. Gen. Elec. Capital Corp., 12 F.3d 686, 689 (7th Cir. 1999). Further, because the agreement is a commercial one, I presume that the parties intended that it make economic sense. Dispatch Automation, Inc. v. Richards, 280 F.3d 1116, 1119 (7th Cir. 2002).

The language of the agreement unambiguously prohibits Mancan-Columbus from supplying employees outside its licensed area. Several provisions in the agreement make this clear. First, the agreement grants Mancan-Columbus an exclusive license to operate in a defined geographical area. The defined geographical area consists of "Franklin County, Ohio, and that portion of Licking County, Ohio which lies west of Highways 661 and 37 ('Licensed Area')." (Jonathan P. Mason Aff. Ex. C at 1.) Second, the agreement authorizes Mancan-Columbus to "solicit business and accept and fill orders only in and

_____

[1]In this section I address the issue of preliminary relief as it pertains to Manpower and Mancan-Columbus. I address the issue of preliminary relief as it pertains to Manpower and Mancan's other two franchises in a later section of the decision.

Case 2:05-cv-00276-LA   Filed 12/14/05   Page 14 of 26   Document 169

from the Licensed Area." (Id. (emphasis added.)) Third, the agreement provides that Mancan-Columbus must refer orders and inquiries from "outside the Licensed Area to us in Milwaukee, Wisconsin." (Id. at 4.) Fourth, the agreement requires Mancan "to diligently promote the services of other offices thereby offering a national and international service to your customers." (Id. at 5.) Finally, in 2000 the parties amended the agreement adding language requiring Mancan-Columbus "to refer business opportunities outside the Licensed Area to the nearest Manpower office." (Id. at 5(b).)

Thus, although the territorial restriction in the agreement could hardly be more clear, Mancan contends that the agreement permits it to solicit business or accept or fill orders outside its licensed territory as long as it does not perform all three acts outside such area. However, the agreement states that the franchisee may "solicit business and accept and fill orders only in and from the Licensed Area," (emphasis added), and thus makes clear that the franchisee must perform each such act in its own territory. Further, Mancan's interpretation would lead to an absurd result, namely that a Manpower franchise could supply employees anywhere in the world as long as it accepted the order in its own territory. This result would undermine the agreement's purpose of granting a franchisee an exclusive license to operate in a clearly defined area. Mancan's interpretation also makes no economic sense because it would harm both Manpower and other Manpower franchises.[2] It is also inconsistent with the agreement's requirement that Mancan-

---

[2]It is also worth noting that Manpower has a procedure – which Mancan had utilized – for dealing with those rare instances when a customer wants to deal with a particular Manpower branch or franchise even though not located in the branch's or franchise's territory. On such occasions, the branch or franchise with whom the customer wants to do business must contact Manpower to obtain permission to service the customer. The branch or franchise in whose territory the customer is located is then contacted and, if no

Columbus refer orders from outside its licensed territory to Manpower or to a Manpower franchise. Finally, before the present lawsuit, Mancan never suggested that the agreement authorized it to operate outside its licensed area. In fact, on many occasions it acknowledged the contrary. Thus, Mancan's interpretation is not only unpersuasive but a last-minute concoction designed to put a better face on a myriad of territorial violations.

Mancan also argues that Manpower's intranet site, which discusses "vendor-management," i.e., subcontracting requests for employees to other employment agencies, authorizes it to supply employees outside its licensed area. However, in light of the franchise agreement this argument also makes no sense. The fact that Manpower allows franchises to subcontract work within their own territory does not authorize them to do so elsewhere. Manpower permits franchises to subcontract in their own territory if they believe that they can best serve a customer by doing so because the monetary loss is their own. However, when a franchise employs a Manpower competitor to fill orders outside its territory, it violates the territorial restriction in the agreement. In addition, it may take money out of the pocket of another Manpower office. This is not to mention that Mancan-Columbus acted deceptively by failing to disclose its extra-territorial subcontracting to Manpower or to offer the business to other Manpower franchises.

Thus, Mancan-Columbus violated the territorial restriction in its franchise agreement, and it did so repeatedly, after numerous warnings and with the intent to deceive Manpower

_____

objection is raised, the customer is allowed to do business with the Manpower branch or franchise of its choice. However, the branch that gets the business is required to pay an infringement fee of fifteen percent of gross profit on the sale to the branch or franchise in whose territory the account is located.

16

and other Manpower franchises. It demonstrated that it could not be trusted to comply with an important provision in the agreement. For example, Ryan represented to Manpower that he reprimanded franchise employees for violating the territorial restriction when behind Manpower's back he told them to continue to violate it. And Jonathan Mason falsely represented to Manpower that Mancan-Columbus had ceased supplying Wasserstrom with employees outside its territory when in fact it continued to do so by using Manpower competitors. Mancan-Columbus became a kind of rogue franchise doing business all over the country in violation of its agreement and the rights of other franchises. Its extra-territorial activities generated numerous complaints and compelled Manpower to constantly attempt to police its conduct. In sum, Mancan-Columbus displayed a lack of commitment to the franchise relationship and destroyed one of its essential objects. Therefore, it is highly likely that Manpower will prevail on the merits of its claim that it justifiably rescinded the agreement with Mancan-Columbus. Mancan disputes this, arguing that Mancan-Columbus paid all franchise fees that it owed Manpower. However, the fact that Mancan-Columbus paid its fees did not exempt it from the obligation to abide by the restrictions in the agreement.

In addition, Mancan-Columbus violated other duties under the agreement, thus strengthening Manpower's already high likelihood of success on the merits. As previously indicated, both federal law and the franchise agreement required Mancan-Columbus to complete and retain I-9 forms showing that its employees were eligible to work in the United States. Mancan-Columbus repeatedly violated this obligation. Manpower's auditor characterized Mancan-Columbus's I-9 violations as the most egregious that she had seen in her sixteen years at Manpower.

17

Further, in violating the I-9 requirement, Mancan-Columbus again displayed disdain for its obligations under the agreement. For example, when an employee told Ryan of the franchise's failings with respect to I-9's, he responded that she should concentrate on increasing revenue and that Mancan-Columbus was "not the INS." (Davis Decl. ¶ 4.) On another occasion, he told an employee that "we're not the INS. Let them weed them out," and "if you put a bow-tie around a temporary employee, he is going to make you money regardless of who they are." (Rader Decl. ¶ 5.) And, when Ryan discovered that an employee had turned over I-9 information to Manpower, he told her that she should have put the information "back into the box," (Kiner Decl. ¶ 13.), and he denied her a promised promotion. Finally, when the employee responded that I-9's were a legal matter, Ryan said that he was "sick and tired of the word 'legal' coming out of your mouth." (Id.)

Mancan depreciates the seriousness of the I-9 violations, arguing that the federal government took no action against Mancan-Columbus and that Mancan-Columbus has corrected the problem. However, the fact that the federal government did not bring charges against Mancan-Columbus is hardly an exoneration. Moreover, Mancan has no response to Ryan's intentional disregard for the agreement, his recklessness or to the risk of embarrassment that his conduct created.

In addition, by misrepresenting that Ryan's consulting company, the Ascend Group, was a division of Manpower, Mancan-Columbus violated its obligation under the agreement not to use Manpower's name without its consent. In a letter concerning a former Ascend Group employee, Ryan stated that the group was a "division of Manpower." (Pollack Decl. Ex. 6.) Further, in his deposition, Ryan falsely denied knowledge that the firm had been described in this way. While in itself this violation might not justify rescission, it again

18

reflects Mancan-Columbus's unwillingness to abide by the restrictions in the agreement.

Thus, I find that it is highly likely that Manpower will prevail on its claim that Mancan-Columbus breached the franchise agreement in material ways and that it justifiably rescinded the agreement with Mancan-Columbus. For the same reasons, I conclude that it is highly unlikely that Mancan will prevail on its claim that Manpower lacked grounds for such rescission.

## B. Adequate Remedy/Irreparable Harm

As previously indicated, a party seeking a preliminary injunction must show that it has some likelihood of success on the merits, no adequate remedy at law and that it will suffer irreparable harm if the requested relief is not granted. As to whether the parties have an adequate legal (as opposed to equitable) remedy, both parties ultimately seek equitable relief: Manpower seeks to enjoin Mancan from using its name, and Mancan seeks to enjoin the rescission of the franchise agreements. Thus, neither party has an adequate remedy at law.

As to the question of irreparable harm, harm is irreparable for purposes of granting a preliminary injunction if it cannot be remedied by a monetary award at trial. Graham v. Med. Mut. of Ohio, 130 F.3d 293, 296 (7th Cir. 1997). I first ask whether Manpower will suffer such harm. If a franchisor lawfully rescinds a franchise agreement, the former franchisee may no longer use the franchisor's name or mark without violating the Lanham Act. Gorenstein Enters., Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989). And, in cases of trademark infringement and dilution, courts generally presume irreparable harm. Eli Lilly & Co. v. Nat. Answers, Inc., 233 F.3d 456, 469 (7th Cir. 2000); see also Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 15,16 (7th Cir. 1992) (recognizing the

19

"well established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business lost"). This is so because the trademark holder loses control over its name and the nature and quality of the product associated with the name. Re/Max N. Cent., Inc. v. Cook, 272 F.3d 424, 432 (7th Cir. 2001); see also Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir.1988) (stating that "[e]ven if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another").

Mancan argues that Manpower will suffer no harm by waiting until trial to obtain relief because it is in its own financial interest to continue to promote Manpower's name. However, if a franchisor properly ends a franchise agreement, "the franchisee cannot be allowed to keep on using the trademark." Gorenstein Enters., Inc., 874 F.2d at 435. The owner of a trademark has a duty to ensure the consistency of the trademarked good or service, and if it fails to fulfill such duty, it will forfeit its trademark. Id. As previously indicated, it is highly likely that Manpower lawfully rescinded its franchise agreement with Mancan-Columbus. Therefore, Manpower will suffer irreparable harm if Mancan-Columbus continues to use its name and mark.

I turn now to whether Mancan will suffer irreparable harm if I grant Manpower's request for preliminary relief and deny its own. A business will suffer irreparable harm if it is forced to shut down while awaiting trial or if the nature of its losses will make its damages difficult to calculate. Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir 1984). In the present case, it is unlikely that granting Manpower preliminary relief with respect to Mancan-Columbus will force either Mancan or Mancan-Columbus out of business. As previously indicated, Mancan operates two other franchises that generate

20

significant revenue. And Mancan-Columbus will be free to remain in the business of supplying temporary employees unconstrained by a territorial restriction. Nevertheless, Mancan-Columbus will incur significant transition costs and will lose substantial revenue if it no longer serves Manpower's national accounts. Moreover, although in principle it would not appear difficult for Mancan to calculate its damages as the result of Manpower's rescission of the agreement with Mancan-Columbus, in practice it might be. See id. Thus, I conclude that Mancan will suffer irreparable harm if I grant preliminary relief in Manpower's favor.

**C.    Balance of Harm/Public Interest**

Thus, I must balance the harm each party will suffer if I grant relief in favor of the other. As previously indicated, when balancing harms, I employ a sliding scale approach: the more likely that a party will succeed on the merits, the less the element of irreparable harm must weigh in its favor; similarly the less likely that the party will succeed on the merits, the more the element of irreparable harm must weigh in its favor. Vencor, Inc. v. Webb, 33 F.3d 840, 845 (7th Cir. 1994). As previously indicated, Manpower is highly likely to succeed on the merits of its claim relating to Mancan-Columbus and Mancan is unlikely to prevail on such claim. Further, both Manpower and Mancan will suffer irreparable harm if I grant preliminary relief in favor of the other. Applying the sliding scale, Manpower is entitled to preliminary relief, and Mancan is not. Therefore, I will order that Mancan-Columbus cease using Manpower's name and mark and return all materials provided by Manpower pending the outcome of the present suit.

Finally, I must consider the effect of a granting or denying preliminary relief on parties outside the lawsuit. Ty, Inc., 237 F.3d at 895. In the present case, such effect is

21

not significant and does not weigh in favor of either party.

**D.    Mancan's Other Franchises**

As previously indicated, Manpower rescinded the agreements governing the Mancan-Canton and Mancan-Fort Myers franchises based on the conduct of the Mancan-Columbus franchise and the fact that Mancan owns each of the franchises.  Manpower does not claim that either Mancan-Canton or Mancan-Fort Myers materially breached their franchise agreements.  Under traditional contract law principles, in the absence of evidence of the parties' intention to treat separate agreements as a single indivisible contract, separate contracts are treated separately.  See United States v. Bethlehem Steel Corp., 315 U.S. 289, 298 (1942).  Thus, the fact that a franchisee operating a number of franchises breached one agreement does not mean that it breached another.  See, e.g., Burger King Corp. v. Mason, 855 F.2d 779, 780 (11th Cir. 1998) (noting that franchisor properly terminated thirteen of franchisee's twenty-seven franchises but not the other fourteen).  In the present case, I am unaware of any evidence indicating that the parties intended that a material breach of one franchise agreement could be regarded as a breach of the others.  See, e.g., 1 W. Michael Garner, Franchise & Distribution Law & Practice § 3.3 (2005) (recommending that franchisors include provisions to this effect in franchise agreements to retain maximum flexibility in dealing with franchisees).  Thus, I conclude that Manpower has little likelihood of succeeding on its claim that it justifiably rescinded its agreements with Mancan-Canton and Mancan-Fort Myers, in which case those franchises would not violate the Lanham Act by continuing to use Manpower's name.  Therefore, Manpower also fails to establish that it would suffer irreparable harm if I deny its request for preliminary relief with respect to those franchises.

22

On the other hand, Mancan-Canton and Mancan-Fort Myers are likely to prevail on the merits of their claim that Manpower unjustifiably rescinded their agreements, and for the reasons stated in my discussion of Mancan-Columbus, they will suffer irreparable harm if I do not grant preliminary relief in their favor.  Thus, the balance of harms weighs heavily in favor of Mancan-Canton and Mancan-Fort Myers.  I therefore will grant a preliminary injunction enjoining Manpower's rescission of the agreements governing such franchises pending the outcome of the case.

## E.     Security

Fed. R. Civ. P. 65(c) requires that I condition the grant of an injunction upon the posting of security.  The purpose of requiring the party obtaining an injunction to post security is to compensate the enjoined party, if it prevails on the merits, for the pecuniary harm caused by a preliminary injunction.  Ty, Inc. v. Publ's Int'l Ltd., 292 F.3d 512, 516 (7th Cir. 2002); see also Cronin v. United States Dep't of Agric., 919 F.2d 439, 446 (7th Cir. 1990) (noting that an injunction bond compensates for the pecuniary harm caused by an injunction).  Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond. Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000).  However, a district court cannot simply set the bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that a reviewing court can determine whether such number "was within the range of options from which one could expect a reasonable trial judge to select."  Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134,1141-42 (7th Cir. 1994) (internal quotation marks and citation omitted).

23

I first address Manpower's bond.  Mancan's potential pecuniary losses stemming from the injunction relating to Mancan-Columbus include lost profits pending resolution of the case and the costs of transitioning to a non-Manpower business.  Manpower recently stated that lost profits for all three Mancan franchises over the next two years (the projected litigation time) would be about $6.3 million.  Because Mancan-Columbus accounts for slightly less than half of Mancan's revenue, Mancan's lost profits resulting from the injunction would be slightly more than $3 million.  Mancan estimates that the costs of transitioning to a free-standing enterprise would be about $7 million for all three franchises.  Thus, the costs attributable to Mancan-Columbus would be slightly less than $3.5 million.  Thus, between lost profits and transition costs, the total losses to Mancan as the result of the injunction in favor of Manpower would be between $6 and $7 million.  Erring on the high side, I will set Manpower's bond at $7.5 million.

As to Mancan's bond, the measure of pecuniary harm attributable to the injunction is the difference between the profits Manpower would earn if it terminated the agreements and took over operation of the Fort Myers and Canton franchises and the profits it would earn without taking such actions.   This figure amounts to about $3.3 million.  Thus, again erring on the high side, I will set Mancan's bond at $3.5 million.

### III.  CONCLUSION

For the reasons stated,

**IT IS ORDERED** that Manpower's' motion for preliminary injunction is **GRANTED IN PART AND DENIED IN PART**.  Mancan-Columbus and its officers, agents, servants, employees, and attorneys, and those in active concert or participation with them, are

24

hereby **ENJOINED** from further use of the Manpower trade name, trademarks and proprietary information, as authorized by the Columbus License Agreements, provided that Manpower give security by depositing with the Clerk the sum of $7,500,000 in a cashiers check or other certified funds within fourteen days of the date of this order.  Failure to provide the requisite security will cause this order to lapse of its own accord.  If Manpower provides the requisite security, this preliminary injunction shall remain in effect until further order of the court, and the $7,500,000 security shall remain with the Clerk until further order of the court.

IT IS FURTHER ORDERED that Mancan's motion for preliminary injunction is **GRANTED IN PART AND DENIED IN PART**.  Manpower and its officers, agents, servants, employees, and attorneys, and those in active concert or participation with them, are hereby **ENJOINED** from rescinding the Fort Myers or Canton franchise agreements between Manpower and Mancan, provided that Mancan gives security by depositing with the Clerk the sum of $3,500,000 in a cashiers check or other certified funds within fourteen days of the date of this order.  Failure to provide the requisite security will cause this order to lapse of its own accord.  If defendants provide the requisite security, this preliminary injunction shall remain in effect until further order of the court, and the $3,500,000 security shall remain with the Clerk until further order of the court.

IT IS FURTHER ORDERED that defendants' motion to strike the declaration of William Duffin is **DENIED AS MOOT**.

IT IS FURTHER ORDERED that plaintiffs' motion to increase the preliminary injunction bond set July 12, 2005 is **DENIED**.

25

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on

**January 4, 2006 at 2:00 p.m. CST.** The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 13 day of December, 2005.


_____ /s _____
                                        LYNN ADELMAN
                                        District Judge

Case 2:05-cv-00276-LA   Filed 12/14/05   Page 26 of 26   Document 169